The next matter is No. 23-1843, Sophia Zhu v. Desktop Metal, Inc. At all. At this time, would counsel to the appellant please introduce himself on the record to begin. Yes, Lucas Gilmore on behalf of the appellant, Sophia Zhu, if it pleases the court, I'd like to reserve three minutes of rebuttal time. You may. Okay. This is an appeal from an order dismissing a securities class action fraud, and in the complaint, it details a brazen scheme orchestrated by defendants to cause the company, Desktop, to deliberately manufacture, market, and sell medical devices in clear violation of FDA regulations. The scheme had the effect of posing significant safety risks to consumers, as well as substantial harm to investors, like my client, who individually lost over $600,000 of her retirement fund. Let me ask at the outset, I know it's been raised in the appellant's brief, but how does a violation of the FDA regulation amount to a violation of securities law? Because it's material information. When you have a company that's highly regulated and it involves their most important products, in addition to it potentially causing a consumer issue or a government issue, that material information impacts the price of the security. And so that inflates the price of the security. And when the truth is revealed, you see the artificial inflation come out. And that's precisely what happened in this case. What are the boundaries of what would be a material information that a company is required to disclose under the securities law? Well, the Supreme Court tells us in Matrix that the boundaries is actually quite wide, and it's a highly factual inquiry. It's any information that a reasonable investor would believe would alter the total mix of  And so more specifically to here, you have the company make statements saying Flexera is one of their key products. It's going to lead to 30% to 40% of their future revenue. And then you also have them warn investors and emphasize that we're a highly regulated company. It's very important to our business that we stay in compliance. Certainly in this competitive field, an investor would value a stock of a company whose leadership intentionally and deliberately violates the FDA that either wouldn't want to buy in that company or certainly would have paid a much lower price. And that's the standard here. Now, in terms of the scheme, there was two components and it's set out in the complaint. The first is the illegal manufacturing of resin at an unlicensed facility. We have confidential witnesses that detail. I, in my career, have not seen confidential witnesses provide this type of picture of where you have an executive during meetings deliberately say that we are going to manufacture at a Montreal facility that's not licensed, ship it to a Michigan facility that's not licensed, and even go so far as to deceive others by having them affix false labels on the bottles to make it appear that it did come from their German facility. Counsel, you're still focusing on your material misstatement claims, not your scheme liability claims right now. Am I correct? No, I'm focusing on the scheme liability and the misrepresentations are a separate legal theory, but our claim is that the misrepresentations are part and parcel of the scheme. So, you have these undisclosed acts that Mr. Ceblani and others are doing. And then in order to bolster the scheme and further hide it, they make public statements, positive statements about Flexera. Yes. What I wanted to ask you, what I wanted to ask you to focus on is, you know, your brief and certainly the proceedings below, there were lots of different misstatements and omissions that were discussed. So, now that we're here on appeal, are there particular misstatements or omissions that you think are the strongest that you want us to focus in on? Yeah. Which would you point us to? I would point to the website statements that are throughout the entirety of the class period, and that is to paragraph 237, in which it covers the entire basis of our claims. They tout Flexera's clearance, FDA clearance. They talk about the light, they talk about the characteristics. Which date? I have the chart that I think you're looking at, so if you could tell me which date of the statement that you're referencing right now. Yes. It's the March 15, the web, it's statements 24 and 25. The final page of that. The March 15, 4-8-K Investor Presentation Earnings Call, which one? I'm sorry, it's the final statements, the two final statements, it's March, their desktop metal website, they're paragraphs 237 of the complaint. Okay. And so that hypes the FDA clearance. That was misleading, gives a reasonable investor the idea that in selling Flexera, they're complying with the FDA process, which they did not. And then it also emphasizes that Flexera is compatible and validated for use with Envision Tech Systems. That was not true. The PCA 4000, which is an Envision Tech System, it was not compatible, yet they unlawfully sold the PCA 4000, represented to customers that it could use the specified characteristics, and they knew that to be false. Counsel, how are those statements not true? They did get clearance, though they didn't have it by March 15, if you're focusing on a March 15 statement. They were in the process of getting the clearance for Flexera, and it was compatible with systems. Maybe you're saying it's not compatible with all of the systems to the extent that you would want, but how is it false?  And so it's, the First Circuit recognized in the Miami case that literal, truthful statements can be misleading if you omit information to render that misleading. And so by touting the FDA clearance, while that is true, they're not, and they're touting the sale of that, it's giving the reasonable investor the impression that you're selling in compliance with your application and the clearance that you received. But the mismanagement that you've alleged in detail in your complaint, had it occurred by March 15? I thought it didn't start until later. No. So why is this March 15 statement about, you know, clearance that they're expecting and which actually comes through, what have they admitted as of March 15 that you think makes this false? The, I would point to FE3 and FE4, who said that they had meetings in March in which El Sivlani directed them to start selling the PCA 4000 together with Flexera. Before prior clearance, they were, there was a heavy pre-ordering and they state in their testimony that those meetings occurred in March. And they knew that it wasn't invalidated at that point and they got pushed back. But I want to emphasize that a key portion of our case was scheme liability. That is separate from making an affirmative misrepresentation. There's two claims within that. There's the Rule 10b-5b, which is an affirmative misrepresentation and omission. And then separately, there's a 10a and c. It doesn't require an actionable misrepresentation. It relies on deceptive conduct, deceptive conduct that materially inflates the stock. So is it your position that we need to address both the scheme liability and the misrepresentation liability on the merits here that those are two distinct inquiries? That is correct, or correct the error that the district court did where the district court did not ever consider it. We flagged that for the court in our papers and flagged it for the court at oral argument and it was not addressed in the order. So the court, it's adequately briefed. We think the complaint sets it forth. The First Circuit would be, you know, well within the right to rule on it. And I think the parties, the First Circuit, as you saw, a dearth of law on a and c. So I think the parties could very much benefit from the First Circuit in talking about the pleading requirements for an a and c. But ultimately here, you know, a complaint in the securities case is nothing under TELL-LABS unless it's considered in whole. And here we have a significant portion of the complaint that was just not considered. Counsel, you, when you filed your opposition to the motion to dismiss, you never raised scheme liability. I mean, it just wasn't in your opposition. So why didn't you forfeit that claim? Yeah, well, under the party presentation rule, we were required to oppose the arguments that were made. The defendant's argument was highly tailored. It was exclusively on the misrepresentations, the 10b. I understand, but the plaintiff's asked to dismiss the complaint in its entirety. And just to sort of put it very plainly, if I get a motion to dismiss from my opposing counsel saying we request the court to dismiss the complaint in its entirety, and I think they've completely ignored one of the key claims I've made, it seems that would be the first point you would make in your opposition. You shouldn't dismiss this complaint in its entirety, Your Honor, because plaintiffs don't, I'm sorry, defendants don't address, you know, this key claim that we made in our complaint. But that wasn't part of the opposition. In the opposition brief, no. But we raised it in a supplemental brief, and we raised it at oral argument, and we would so under even defendant's own case law, the Gomez case, that we raised the flag. You preserved it for all purposes. It's been raised. I'm sorry, I'm not following. No, for the record below, it was preserved and it was raised. Yes, yes. Because after the motion, it may not be in the motion, as Judge Rickman was asking, but you're saying during argument you raised, like, that Fawani, for example, is an alternative. We also have this. That is correct. Yeah. And so on this record, it cannot be shown that we forfeited this claim. I'm sorry. I think I'm confused. I did read where you brought it up at oral argument. I don't, did you bring it up in the supplemental briefing? Could you direct me to that? Because I didn't hear that. In the supplemental brief, it's JA 638, I believe. We referenced that we have valid 10 A and C claims. I think you referenced it, but you don't really elaborate. I mean, I think it's maybe a clause. I'm not even sure if it's a whole sentence. And isn't our case law pretty clear that something stated for the first time at oral argument isn't sufficient to preserve? Again, we would say that, you know, we pled it expressly. There was never an intent to intentionally forfeit. We have portions of our complaint that are entitled fraud scheme. We summarize that in our complaint. We cite to the provisions. The motion exclusively focused on the misrepresentations. But, no, the motion asked to dismiss the complaint in its entirety. So I'm just not sure how you can say that it focused exclusively on the misrepresentations. It asked the court to dismiss your entire complaint. And in response, you didn't say you shouldn't because they haven't addressed our scheme liability claim. We did not in the brief. We could have. But, you know, we did raise it to the court subsequently. And I think on that record, you can't find that we forfeited the claim. So it's not like you're saying it's not like raising for the first time before us a claim. It was discussed below and considered by the court at a particular time developing the record. That's right. And then the court, at the end, mentioned something to the effect, I'll paraphrase, I will consider this after I issue an order. And in here, it was dismissed in the entirety without any type of reference or analysis to the scheme liability claim, which is separate and distinct and on certain of the elements likely would have led to a different result. I guess I don't see how, based on your briefing below, the district court would have been fully informed about the scheme liabilities claims. But I do understand your argument. You referenced it in your supplemental briefing, and you referenced it at oral argument. That's correct. Okay. Thank you. You're going to have three minutes for rebuttal. Let's hear, then, from Mr. Martinez. Please introduce yourself on the record to begin. Good morning, Your Honors. May it please the Court, Roman Martinez for Desktop Metal and the individual defendants. Your Honors, when Desktop Metal learned about the problems with marketing and selling Flexera and the PCA 4000, it took immediate action to investigate, disclose, and remediate the issues. There was no securities fraud here. I want to emphasize two points. Number one, plaintiff forfeited her scheme liability theory for some of the reasons that have already been raised below, and I want to talk about that in detail. Number two, there were no false statements or omissions here. Let me just start with clearing up the record below with respect to the scheme liability theory. Judge Rickleman, you're exactly right. We made a motion to dismiss that was very clear over and over again. I'll just point the Court to pages of the Joint Appendix 519, 523, 537, 605, and 623. Over and over again, we made absolutely clear we were not making a tailored motion to dismiss, as the other side has said. We were making a full motion to dismiss the entire complaint. That was unambiguous to us. It was unambiguous to Judge Talwani, who expressly recognized as much at page 682 during the hearing. So we made a full motion to dismiss. We made that reasonably because we understood that they were only raising misstatement claims. If they thought that they had some separate theory that we weren't addressing, it was incumbent on them to tell the Court, tell Judge Talwani, that one reason why we should not get the relief that we were seeking, full dismissal, was that they had another scheme liability theory that could survive. They didn't do that. In fact, they conceded that they didn't do that at the hearing. At the hearing, literally in the closing minute or so of the hearing, on page 40 or 41 of the 41-page transcript, and there's like circe or rebuttal, whatever it was, they raised for the first time, they said, hey, by the way, we've got this other theory. At which point Judge Talwani said, well, wait a second, you didn't raise this in your papers. And the other side conceded they didn't raise this in their papers opposing the motion to dismiss. And she said, well, you know, it's not presented because they made a full motion to dismiss. The other side conceded it, offered to brief it. So the other side knew that they needed to be making to Judge Talwani an argument based on their scheme liability theory. They did it belatedly. It was too late at that point. So it was not preserved respectfully. Now, they say today that, oh, we preserved it in our supplemental brief, as though they wrote a brief saying, oh, here's why our scheme liability theory survives. But if you look at the supplemental brief, and it's at page JA634, the supplemental brief was asked for by Judge Talwani because she wanted the parties to address the Obiomed decision, which had nothing to do with scheme liability. And so what the other side did was, for the first time in the case, they actually mentioned in passing, and I think it was, you're right, it was a clause or half a sentence, they just sort of threw out a cite to some provisions A and C, as though that were sort of enough to put the district court on notice that they had this other scheme liability theory. And then they stand up here, and they say, oh, we raised this in our papers. And what they're referring to is this, like, half sentence of a mentioning of provisions A and C in the supplemental brief that had nothing to do with scheme liability. Respectfully, that doesn't even come close to preserving the issue. They say that the party presentation principle means that we had to somehow specifically target that theory. That's not right. We specifically asked for, we presented our arguments for full dismissal of the complaint. Having presented those arguments, it was incumbent on them to come back with their responses. And then the last thing I'll say on this is that... Presumably, and I don't know if you represented the same clients below, presumably you moved to dismiss every claim that you thought the complaint presented. So the question I have for you is just, what would a scheme, in your view, this complaint didn't assert a scheme liability claim, what, in your view, would be enough to assert a scheme liability claim such that you shouldn't have been on the hook to move to dismiss it? If they had asserted it? What would you expect it to look like? Well, I think the Lorenzo case is one example from the Supreme Court, where the court said that you had an individual who was not the maker of the statement, but he disseminated the statement. So if they had a fact pattern like that, if they were saying, for example, that there was actually dissemination by someone with Sienter, and it was everything except not technically the maker, then that would be a viable claim. There are other examples of scheme liability theories, pump and dump schemes. It just doesn't look like anything like what we have here. And so they haven't asserted this theory at all in their case. In fact, the last thing I'll just say, my friend on the other side pointed to their complaint, and he said, oh, our complaint made clear we summarized our scheme liability theory. I think it's really important to look at where they did summarize the scheme liability theory. It's at page JA138, and here they have a heading. It's heading six. It says materially false and misleading statements and omissions. And then they've got the subheading, and it says summary of defendant's fraud scheme. This is the kind of thing that was exactly why we understood them only to be raising a misstatement claim, because their entire summary of their fraud scheme is part of their misstatement claim. So these are the circumstances in which we filed our partial motion to dismiss the way we did. So you're not saying the problem was that they didn't explicitly reference the subsections A and C. You're just saying there were no facts to support what you understand to be a scheme liability claim, like dissemination or pump and dump. That's right. If they had responded, if they had preserved the argument properly by responding to our motion to dismiss, then we would have explained to the district court why they didn't have a scheme liability theory on the merits. But what we're saying is that for purposes of appellate review, they have forfeited their ability to come in and save their complaint based on a scheme liability theory, because they didn't, not only did they, we don't think they sufficiently alleged in the complaint, but more importantly, they didn't argue it as a reason to oppose our motion to dismiss. So that's just a straight-up forfeiture. I don't think you need to get into the merits at all. And the last point I'll just say is, as a practical matter, a rule or an approach to forfeiture, like what my friends on the other side are proposing, is going to be extraordinarily unfair to a district court. Imagine if you're a district court and you get a complaint like this one. It's 153 pages long. It's very repetitive. It's ambiguous as to exactly what's going on. And on their view, the district court's job is to sua sponte, go line by line through 153 pages, to figure out every conceivable theory that might possibly be alleged under Twombly and Iqbal, and then figure out whether the motion to dismiss attacks every single one of those theories. That's not the right way to think about this. The right way to think about this is the district court should be able to rely on the parties, and especially to rely on the plaintiffs, to make the obvious argument that if the motion to dismiss doesn't address one of the main theories of the case, the plaintiffs are the ones who are going to pop up, as you said, Judge Regelman, point that out, and then the district judge can adjudicate that. We can't expect district judges to be mind readers. It's very unfair, and that's just not the way that forfeiture works. So I think the scheme liability claims are really out of this case. So what we're really left with is a case that's about misstatements and omissions, and I think the problem that the other side has on that, and this is why I think they've pivoted to a scheme liability theory, is that there just were no false or misleading statements here. They have two categories of statements that they point to. I'm happy to talk about any of them. The first category is this idea that the defendants were saying that Desktop Metal had fully complied with FDA regulations, and the problem that they have with that theory is that we never actually said that. There's no statement that they can point to that asserts compliance or full compliance with the regulations. The closest they come, or the way they try to get there, is by using the statement, they pointed to one example of it in the statement at JA-173 that my friend on the other side was just talking about, is where there's a statement about the product that Flexera being cleared, and that's an obvious reference to 510K clearance by the FDA. But 510K clearance is just one type of clearance, and it's indisputably true that we did have that clearance. That's not even the source of the regulatory violation that the other side is asserting. And so when we said that the product Flexera had been 510K clear, we were not asserting perfect compliance. And two things that I would just say to reinforce that, if you actually look at the document, the FDA 510K clearance, it's not in the record, but we cited it with a link in our papers, it specifically says, this is the letter giving the 510K clearance, it says, please be advised that FDA's issuance of a substantial equivalence determination, which is the 510K clearance, does not mean that FDA has made a determination that your device complies with other requirements of the Act. And then it goes on to list a bunch of different requirements, including the good manufacturing practice requirements. So on its face, 510K clearance does not suggest that the FDA was sort of saying that we were in full compliance with every FDA regulation. And so when we said that we were 510K cleared, we were not making a statement that there was perfect compliance. Can I ask you about a few of the other statements that have been covered in the brief? So, for example, there was a statement made in an August earnings call, I believe, that desktop metal was adding capacity to meet the demand for Flexera, and one of the arguments made is, well, why isn't it misleading to admit that that capacity was being created through production that didn't meet FDA regulatory standards? So that's a pretty direct statement. We're adding capacity to meet demand omission. We're doing it by violating FDA regulations. Why isn't that misleading? You know, I don't know that that's one of the ones that they emphasized in their brief, so I'm not sure I can give you the perfect answer to that specific statement. But as you have reminded me of it, I don't think that that statement is false. I don't think they're saying that we were not, in fact, adding capacity. And it's not clear to me that the time periods match up or that the capacity that's being discussed there even implicates the very small percentage, 10% of the Flexera products that were allegedly being manufactured in the improper facility. Why would the time period not match up? I thought that was squarely the time period where it was being manufactured. I just don't have that. I don't remember that particular allegation because they didn't emphasize that in their brief. So I'd have to go back and look. It's possible. But either way, I don't think that that statement implies anything about full regulatory compliance. And again, here we're talking about... Isn't it fair to imply that if a company says they're adding capacity, that they're adding capacity in a lawful manner? I think so, but I don't think that alleges that they're not adding capacity that is in compliance with the law. I think the question is whether if they were only adding like bogus capacity, then maybe there would be a stronger claim. But that's not the allegation that I think they're pointing to or that they're making in the complaint. And so I think, again, this sort of, you know, there are a lot of cases out there talking about and we cite some of them, the fact that investors recognize there's not going to be perfect regulatory compliance. And so I think it's a stretch to say just because the company says that it's doing something, that that implies like perfect regulatory compliance as to everything that they say they're doing. And so that's not... But this isn't about everything. That's why I wanted to narrow you, you know, focus you on the statement. This isn't about everything that we're doing. It's a very specific statement about we're adding capacity to meet the demand for Flexera. And they've admitted that part of the way they're adding the capacity is by violating FDA regulations. And, you know, I understand the case law which says the emission has to be related to the scope of the disclosure. So I guess my question here is why isn't that emission related to the scope of this particular disclosure? I don't think there's an allegation that they were only, that that reference, that statement that you're pointing to was referring only to the extra capacity that was being generated allegedly by the manufacturing in the wrong place. If they were making that... Why would it have to refer only to the illegal capacity? It's a statement that they're adding capacity, and one of the ways they were doing it was on law. Well, I think if the company were to make a statement that, you know, hey, we're manufacturing Flexera, I think you could make a similar argument to the one you're making and say, well, you know, that implies that you were manufacturing Flexera in a way compliant with all regulations. And that would sort of allow in through the back door an idea that any regulatory violation constitutes a violation of securities law. And I don't think that's the way that courts have traditionally looked at this. I think people recognize, investors recognize that there are going to be compliance issues from time to time and that a company is not certifying full compliance. And here, of course, you have the express statements that were made to investors in the securities filings that said that, you know, that one of the risks that the company faces, that they would conclude that it wasn't actually satisfying all the regulatory requirements. I just don't, I don't think that's enough to get them home. I think, you know, the statement that they pointed to was the one on the website. One thing to note about the website, of course, is it's not targeted to investors. I mean, what's really going on here is that they're trying to take what's at best allegations of consumer fraud and sort of recharacterize them and twist them into a securities fraud class action. That's why they're relying on statements that were made to consumers on the website. But even as to that website statement, they pointed to two aspects of it. They said, you know, it hypes our FDA clearance. For the reasons I've already explained, the FDA clearance statement was true because we were talking about 510K clearance as the statement that they point to on papers JA 172 to 173 makes clear. And then with respect to the compatibility with the EnvisionTech systems, I think there's no dispute that Flexera is compatible with the printer, the CDLM and DLP printing systems that EnvisionTech puts out there. In fact, when EnvisionTech wanted to be very clear about, wanted to be specific about what products could be used with Flexera, it was expressed about that. If you look at HJA 152 to 153, there the company is touting Flexera's qualities and saying this is what it can do when it's used with our specific printers. So I think for all those reasons, the statements that they've emphasized here today don't work. I'm happy to talk about any other statements. But I think just sort of stepping back from all this, big picture we see this as a consumer fraud, a set of consumer fraud allegations that they're trying to kind of creatively shoehorn into a securities case. But we think the most straightforward way to resolve the case is to do, you don't have to do everything that the district court did because there were multiple grounds that we won on. But I think number one on scheme liability, it's straightforward forfeiture. And then once you get rid of the scheme liability theory, then all you have left are misstatement claims. And I don't think you need to get to CENTER, although we have good arguments on CENTER. I think you could just say that there was no problem with, we never asserted that there was full regulatory compliance. And 510K clearance doesn't assert that. And then with respect to the PCA 4000 statements, those statements were true. Can I ask you about the statement of Flexera being validated for use with Envision TEC systems? Yes. I think your response to that is that it's literally true that Flexera was validated because it was tested with certain or some Envision TEC products. Do I have that right? But this one seems a little bit of a close call. So here's, I think, the way to think about it. As you may recall from the briefs, it's a little complicated. I didn't know much about 3D printing until I got into this. There's sort of three steps. The first step is you print the thing, then you slough off the rough edges, and then you cure it. And Flexera was designed to be used, according to the allegations in the complaint and the statements that are quoted there, exclusively with Envision TEC printers. So that's CDLM and DLP printers. And there's no dispute in this case that Flexera is fully compatible with all of those Envision TEC printers. And, in fact, that's the statement I was pointing to at 152 to 153 of the appendix, where Flexera is explicit that, like, here's the great results you can get with Flexera when you use our printers. And so there's no dispute about that. In addition to that, with respect to the curing boxes, Envision TEC brands an OtoFlash curing box, which I think is undisputed, can be used with this product. There's also a different curing box that they don't talk about, the PCA 2000, which they don't say cannot be used with the product. So I think when you put all that together, it's certainly true that Flexera can be used with, is compatible with a wide range of Envision TEC systems, including essentially all the printers and at least some of the curing boxes. And I think, in context, that this statement is not false or misleading. Thank you. Thank you. Okay, let's hear a rebuttal, three minutes. Counsel Gilmour. Please do introduce yourself back on the record. Yes, Lucas Gilmour for the appellant. The court asked what a scheme liability claim would look like in terms of dissemination, and that's what we have here. No fraud is ever disclosed to the market. What you have is it's concealed. The information that the person who concealed it was El Sablani, the orchestrator. He's for desktop. And then the dissemination was the positive statements regarding Flexera and PCA 4000, the exact products that are being in violation in the sale of the FDA. There was a discussion about an inference on Scienter about the immediate action that the company took, and that's something that district court did. They only took the immediate action after a whistleblower brought it to the attention of the HR department, not the individual defendants. And, in fact, that same whistleblower brought the issue to El Sablani, and El Sablani did nothing. So the inference is that they only acted when the fraud, when the gig was up. There's this issue about perfect compliance. We recognize that, yes, companies deal with FDA aren't in perfect compliance. There can be issues of negligence or just corporate mismanagement, but that's not what we're hearing. That's not what reasonable investors expect. Reasonable investors don't expect that executives and a director on the actual company is going to engage in intentional and deliberate violations of the FDA, and that's what occurred. So there was no good faith disbelief or good faith discussion with the FDA. Here, there's intentional, deliberate violations. The August statement of adding capacity, we think that that's directly on point of a misstatement that was made. That misstatement was also, in addition, made by desktop. The cable vision court case, the First Circuit, says that any agent that works for the company, that knowledge can be imputed, and so there's scienter with that statement. It's a misstatement. That's an actionable misstatement. That should have moved forward. There's, I think we went over it, that there's this idea of this risk disclosure negates falsity or negates scienter. We suggest that the risk disclosure actually increases on both of those elements because it warns of issues that might occur or may occur. Here, there was actual noncompliance going on at the time they issued these risk disclosures, so it's both misleading and, we believe, intentional. And in the idea of a consumer fraud, I think we sum that up, that there can be securities cases that breach over into various different environmental issues, consumer issues, regulatory issues. But if it impacts the value of a stock, and certainly here, I mean, collectively, we're talking about nearly $700 million in market cap that was lost. This is an investor problem. Thank you. Thank you, counsel. That concludes argument in this case.